NOT DESIGNATED FOR PUBLICATION

No. 107,494

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

EDWARD JAVON BROWN,
*Appellant*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; NANCY E. PARRISH, judge. Opinion filed March 18, 2016.
Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Jodi Litfin*, assistant district attorney, *Chadwick J. Taylor*, district attorney, and *Derek Schmidt*,
attorney general, for appellee.

Before PIERRON, P.J., BRUNS and GARDNER, JJ.

*Per Curiam*: Edward Javon Brown appeals his conviction of one count of
aggravated battery under K.S.A. 21-3414(a)(1)(A). First, Brown argues the district court
erred in giving an inference of intent instruction to the jury which lessened the State's
burden to prove the intent element of aggravated battery. Second, Brown contends the
court erred in failing to give an accomplice cautionary instruction even though an
accomplice witness testified at his trial. Third, Brown argues that a temporary
substitution of judges during jury deliberations violated K.S.A. 43-168 and constitutes
reversible error. Fourth, Brown argues cumulative error deprived him of a fair trial.

1

Finally, Brown contests the use of his juvenile adjudications in calculating his criminal history for sentencing purposes. We affirm.

On the evening of August 31, 2010, John Martin was shopping at a convenience store at a small shopping center located at 15th Street and Adams Street in Topeka. The parking lot of the shopping center was lit by street lamps and an illuminated sign. Martin walked out into the parking lot with his purchases and was attacked by Edward Brown, a black man, and James Pack, a white man. Martin had never met Brown and did not know why Brown had attacked him. Brown repeatedly hit Martin in the head and called him a "bitch" and a "faggot." Martin fell to the ground and Brown continued to hit him and kicked him in the head at least once. Martin thought Pack may have been trying to pull Brown off of him.

Martin was not sure how long the attack lasted, but he eventually lost consciousness. Martin had significant trauma to his face. His left eye was swollen shut, and he had cuts on his forehead and cheek. Martin received 40 stitches to close the cuts around his left eye. He had a fractured occipital bone, and a cut on the back of his head that required staples. The frontal area of his brain was bleeding. Martin's injuries took over a month to heal. As a result of his injuries, he continued to have headaches and double vision when he looked in certain directions.

Michael MacDonald was working at the liquor store in the shopping center that night. MacDonald testified that Brown and Pack approached the liquor store. The doors to the store were locked at that time, but Pack tried to force them open and then hit them. Brown and Pack then went to the liquor store's walk-up window. MacDonald sold alcohol to them after they apologized for their behavior. Brown was wearing a pair of shorts and a red ball cap. MacDonald could not remember what Pack was wearing but testified that Pack had tattoos up and down his arms.

2

MacDonald testified that approximately 20 minutes later, he was outside smoking when he heard calls for help. He saw Brown standing over a man on the ground. Brown was hitting the man in the head and Pack was kicking him. Brown and Pack then took off running eastbound on 15th Street. The liquor store had a surveillance camera that captured the walk-up window but not the entire parking lot. The surveillance video from that night showed two men matching MacDonald's description at the walk-up window around 10 p.m.

Officer Justin Long responded to the scene and saw Martin in the southwest corner of the parking lot. Martin was crouched in a fetal position, holding his face in his hands. Officer Long saw a pool of blood on the pavement. Martin's face was completely covered in blood.

A witness told Officer Long that a black man and a white man had attacked Martin and then ran eastbound on 15th Street.

Officer Aaron Jones also responded to the scene. Officer Long told him that witnesses had last seen the two suspects running east on 15th Street to Hudson Street. Officer Jones went to 15th Street and Hudson Street and saw Brown and Pack running up the road. Officer Jones testified that Brown was wearing red shorts, a red hat, and a red-and-black shirt and Pack was wearing a cut-off sleeve shirt and had tattoos down both arms. Brown and Pack were about 600 yards from the shopping center. Officer Jones apprehended Brown and Pack and took them into custody.

Pack testified at trial for the State. According to Pack, he and Brown had gone to the liquor store that evening. He identified himself and Brown as the two men in the surveillance video. After leaving the liquor store, they saw Martin in the parking lot. Pack did not know Martin, but Brown claimed Martin had been harassing Brown's girlfriend. Pack told Brown, "Do what you gotta do."

3

Pack testified that Brown attacked Martin from behind and hit him in the head with a closed fist. Brown repeatedly hit Martin in the head and called him some curse words. Pack tried to pull Brown off of Martin. Brown kicked Martin in the face. Pack heard Brown say something like, "I bet you won't mess with nobody else's girl." According to Pack, he and Brown left the parking lot and headed east on 15th Street toward Pack's house. The two were stopped by police on their way.

Pack testified he was also charged as a result of this incident. He agreed to a sworn deposition prior to the State making any offers or promises. In his deposition, he said he was saying exactly what had happened that night. As a result of providing information under oath in the deposition, Pack received the benefit of a plea bargain. He testified he was on supervised probation as a result of his plea, but this did not affect his testimony in any way.

Brown testified in his defense that he had walked to the liquor store with Pack that night to buy some beer. Brown identified himself in the surveillance video as the man in the red shorts, red hat, and black shirt. According to Brown, Pack spoke with a man at length near the liquor store. Pack and the man then walked toward a white SUV parked in the parking lot. Brown ran into another man he knew and spoke with him regarding a local copper theft. Brown then decided to go back to Pack's house to meet his girlfriend who would be returning from work soon. Because he was worried about missing her, Brown decided to run back to the house. On the way, the white SUV drove past him and honked. As he turned around, Brown saw Pack 15 or 20 feet behind him. Officer Jones then pulled up and stopped Brown and Pack. Brown told Officer Jones he did not know anything about an altercation at the gas station. At trial, Brown denied ever hitting Martin.

The State charged Brown with one count of level 4 aggravated battery (great bodily harm). A jury convicted Brown as charged. The district court sentenced Brown to 162 months imprisonment and 36 months of postrelease supervision. Brown appeals.

Brown questions the propriety of jury Instruction No. 8, which stated:

"Ordinarily, a person intends all of the usual consequences of his voluntary acts. This inference may be considered by you along with all the other evidence in the case. You may accept or reject it in determining whether the State has met its burden to prove the required criminal intent of the defendant. This burden never shifts to the defendant."

This instruction is identical to PIK Crim. 3d 54.01. Brown did not object to the instruction at trial, but he now argues the inference of intent instruction was in error because it diluted the State's burden to prove his intent beyond a reasonable doubt. According to Brown, aggravated battery (great bodily harm) is a specific intent crime, but this instruction could have allowed the jury to convict him under an intent standard which is closer to recklessness. Because he claims this lowered the State's burden of proof, this instruction also violated Brown's due process rights. Because of this, he contends we should apply the constitutional reversibility standard. According to Brown, evidence of his intent was not overwhelming, so this standard is not met.

The State argues this instruction only informs the jury of a permissive inference. The Kansas Supreme Court has routinely upheld this specific instruction. Furthermore, when considering the jury instructions as a whole, the district court properly instructed the jury on the law in this case.

*Standard of Review*

A party cannot claim error for the district court's giving or failing to give a jury instruction unless (1) the party objects before the jury retires, stating distinctly the matter

5

to which the party objects and the grounds for the objection; or (2) the instruction or the failure to give the instruction is clearly erroneous. *State v. Smyser*, 297 Kan. 199, 204, 299 P.3d 309 (2013). An appellate court uses a two-step process in determining whether the challenged instruction was clearly erroneous. First, the court must determine whether there was any error at all by considering whether the subject instruction was legally and factually appropriate, employing an unlimited review of the entire record. Second, if the court finds error, it must assess whether it is firmly convinced that the jury would have reached a different verdict without the error. *State v. Clay*, 300 Kan. 401, 408, 329 P.3d 484, *cert. denied* 135 S. Ct. 728 (2014). Reversibility is subject to unlimited review and is based on the entire record. The party claiming error in the instructions has the burden to prove the degree of prejudice necessary for reversal. *State v. Betancourt*, 299 Kan. 131, 135, 322 P.3d 353 (2014).

*The Inference of Intent Instruction Was Legally and Factually Appropriate*

Brown did not object to the instruction, so he can only claim error if the instruction was clearly erroneous. In this case, however, the instruction was legally appropriate, so there was no error. The Kansas Supreme Court has consistently held that PIK Crim. 3d 54.01 does not impermissibly alter the State's burden of proof. See, *e.g.*, *State v. Ellmaker*, 289 Kan. 1132, 1143-44, 221 P.3d 1105 (2009), *cert. denied* 560 U.S. 966 (2010). As explained in the PIK Committee's Notes on Use for PIK Crim. 3d 54.01, the inference of intent instruction "is a rule of evidence and does not deal with the required element of criminal intent necessary for conviction in those cases where criminal intent is a necessary element of the offense." Moreover, the instruction was "designed to make it crystal clear that the 'presumption' is only a permissive inference, leaving the trier of fact free to consider or reject it." PIK Crim. 3d 54.01, Comment. Instruction No. 8 even notes: "You may accept or reject [the inference] in determining whether the State has met its burden to prove the required criminal intent of the defendant

6

Brown perhaps attempts to distinguish his argument by asserting the instruction lessened the State's burden to prove the specific intent required for aggravated battery. According to this court, however, aggravated battery under K.S.A. 21-3414 became a general intent crime after a 1992 amendment to the statute. *Gross v. State*, 24 Kan. App. 2d 806, 808–09, 953 P.2d 689, *rev. denied* 264 Kan. 821 (1998). Brown relies on *State v. Frye*, 294 Kan. 364, 374-76, 277 P.3d 1091 (2012), to support his position that aggravated battery is a specific intent crime. He draws attention to the part of the *Frye* opinion that states level 4 aggravated battery "require[s] an intent to do the harm that results." 294 Kan. at 376. This court, however, has already rejected this argument, noting this portion of the *Frye* opinion was dicta and relied on a case discussing second-degree murder, not aggravated battery. *State v. Hobbs*, No. 107,667, 2013 WL 1457940, at *3 (Kan. App. 2013) (unpublished opinion), *aff'd* 301 Kan. 203, 340 P.3d 1179 (2015). Because aggravated battery is not a specific intent crime, the instruction could obviously not have lessened the State's burden to prove the requisite specific intent.

Even if aggravated battery were a specific intent crime, however, the instruction would still have been legally appropriate. Brown argues Instruction No. 8 could have allowed the jury to convict Brown merely because he had voluntarily committed an act that caused great bodily harm without having to prove the specific intent to cause such harm. Brown relies on *Ellmaker* in support of his argument. In *Ellmaker*, the defendant challenged the use of PIK Crim. 3d 54.01, claiming it lowered the State's burden to prove the specific intent and premeditation elements of premeditated first-degree murder. At trial, however, the defendant had requested PIK Crim. 3d 54.01-A on general intent. The Kansas Supreme Court noted that PIK Crim. 3d 54.01-A, which "reiterates the direction" of PIK Crim. 3d 54.01, blurs the line between general and specific intent crimes. 289 Kan. at 1141. PIK Crim. 3d 54.01-A, however, is distinct from PIK Crim. 3d 54.01 and is only intended for use with general intent crimes. PIK Crim. 3d 54.01-A, Notes on Use. While the *Ellmaker* court never reached the issue of whether PIK Crim. 3d 54.01 lessens the State's burden to prove specific intent to kill, it did find that PIK Crim. 3d 54.01 did

7

not lessen the State's burden to prove premeditation to kill for first-degree murder. 289 Kan. at 1144. Later cases extended this ruling to specific intent in particular. See, *e.g.*, *State v. Nelson*, 291 Kan. 475, 482-85, 243 P.3d 343 (2010); *State v. Lansford*, No. 107,918, 2013 WL 5610212, at *15-16 (Kan. App. 2013) (unpublished opinion). Furthermore, the *Ellmaker* court noted a permissive inference of intent still requires the State to demonstrate to the jury that it should infer intent from the proven facts, thus it does not relieve the State's burden of proof. 289 Kan. at 1144 (citing *State v. Harkness*, 252 Kan. 510, 526, 847 P.2d 1191 [1993]). Because an inference of intent instruction does not relieve the State's burden to prove specific intent, the instruction was legally appropriate.

*Any Error was Harmless*

Brown argues that because the inference of intent instruction lowered the State's burden of proof, his due process rights were violated and we must apply the constitutional harmless error test laid out in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). The Kansas Supreme Court, however, has already held that a permissive inference of intent instruction does not violate a defendant's constitutional right to due process. *State v. Stone*, 253 Kan. 105, 105-08, 853 P.2d 662 (1993). Furthermore, characterizing an issue as a constitutional claim does not overcome Brown's failure to raise the issue at the district court level. See *State v. Williams*, 295 Kan. 506, 517, 286 P.3d 195 (2012) (Characterizing an issue as a constitutional claim does not advance the procedural posture when the instruction was not requested below.). As K.S.A. 22-3414 states, if a party does not object to the giving or failure to give an instruction, any error will be analyzed under the clearly erroneous standard.

Under the clearly erroneous standard, an appellate court must assess whether it is firmly convinced that the jury would have reached a different verdict without the error. *Clay*, 300 Kan. at 408. Supposing Instruction No. 8 was erroneous, however, the record

8

does not suggest the jury would have reached a different verdict without the error. Jury Instruction No. 6 stated that the State had the burden of proof. The State reiterated this point twice in closing arguments. In addition, the State presented significant evidence of Brown's guilt including eye witnesses who positively identified Brown as the attacker; testimony from Brown's codefendant Pack; and surveillance video confirming Brown was at the scene of the crime. Brown was the only defense witness, and the State was able to call into question his credibility, at least to some degree. Thus, even if the instruction had been erroneous, the record does not support a firm conviction that the jury would have reached a different verdict without it.

Brown argues Pack was an accomplice witness, and the district court committed reversible error in failing to give the jury an accomplice cautionary instruction. The State does not contest that Pack was an accomplice witness but maintains any error in not giving the instructions was harmless.

*Standard of Review*

Brown did not object to the district court's failure to give an accomplice cautionary instruction, and the record does not indicate he requested the instruction. In such cases, an appellate court must determine if the failure to give the instruction was clearly erroneous. *Smyser*, 297 Kan. at 204. First, an appellate court must determine if the instruction was legally and factually appropriate. If so, the court must determine whether it is firmly convinced the jury would have reached a different verdict if the instruction had been given. *Clay*, 300 Kan. at 408.

*An Accomplice Cautionary Instruction Was Legally and Factually Appropriate*

Whether an accomplice instruction was legally and factually appropriate depends on whether the witness was actually an accomplice. *State v. Simmons*, 282 Kan. 728, 734,

9

148 P.3d 525 (2006). An accomplice is a person who solicits, requests, or commands another person to commit a crime, or aids the other person in planning or committing it, with the intent to promote or facilitate the commission of the crime. *State v. Tapia*, 295 Kan. 978, 996-97, 287 P.3d 879 (2012); see also PIK Crim. 3d 52.18 (now PIK Crim. 4th 51.090) ("An accomplice witness is one who testifies that [he] was involved in the commission of the crime with which the defendant is charged."). When an accomplice testifies, the better practice is for the district court to give an accomplice cautionary instruction regardless of whether the testimony is corroborated or not. *Tapia*, 295 Kan. at 996 (citing *State v. Moore*, 229 Kan. 73, 80, 622 P.2d 631 [1981]); see PIK Crim. 3d 52.18, Notes on Use.

Both Brown and the State agree that Pack was an accomplice witness. Pack was charged in connection with the incident and testified at trial regarding his and Brown's involvement. Pack told Brown, "Do what you gotta do" prior to the attack on Martin and was with Brown during the attack. Under the facts of this case, an accomplice instruction was legally and factually appropriate.

*The District Court's Error was Harmless*

In determining whether the failure to give an accomplice instruction was reversible error, Kansas appellate courts "have examined the extent and importance of an accomplice's testimony, as well as any corroborating testimony." *Tapia*, 295 Kan. at 997. Reversible error does not occur due to a district court's failure to give an accomplice cautionary instruction where the accomplice witness' testimony "'is corroborated by other evidence and the witness' testimony does not provide the sole basis for a resulting conviction.'" 295 Kan. at 997 (quoting *Simmons*, 282 Kan. at 740). Also, when the jury is cautioned about the weight to be accorded testimonial evidence in another instruction, a district court's failure to give an accomplice cautionary instruction is not reversible error. 295 Kan. at 997 (citing *Simmons*, 282 Kan. at 740).

In this case, the district court's failure to give an accomplice cautionary instruction was harmless. Pack's testimony was not the sole basis for Brown's conviction. His testimony was corroborated by Martin and MacDonald. Martin positively identified Brown as his attacker, and MacDonald testified he saw Brown hitting Martin. The State elicited testimony from Pack that Pack had been charged in conjunction with the case, and he had received the benefit of a plea deal based on his statements in a sworn deposition. Furthermore, the court also gave an instruction on witness credibility.

Brown argues, however, the district court's error was reversible and cites to *Simmons* in making his case. In *Simmons*, several alleged accomplice witnesses testified at trial along with the victim. The victim was not able to positively identify the defendant and was only able to give a general description that mostly matched the defendant's appearance. The testimony of the alleged accomplice witnesses "played an important role" in tying the defendant to the victim's described attack. The *Simmons* court found failure to give an accomplice cautionary instruction was harmless error, however, because the witnesses' testimony was corroborated; they were subject to cross-examination about their credibility; their testimony was not the sole basis of the defendant's conviction; and the court gave an instruction on witness credibility. 282 Kan. at 740-41.

Brown argues his case is distinguishable from *Simmons* and thus the error in his case is reversible. According to Brown, the testimony of the alleged accomplice witnesses in *Simmons* played an "important role" in the defendant's conviction. In contrast, Brown contends Pack's testimony played a central role. In defense of his position, Brown notes the prosecutor specifically mentioned Pack's testimony in his closing argument. The prosecutor, however, first discussed the testimony from Martin who, unlike the victim in *Simmons*, was able to positively identify Brown as his attacker. The prosecutor then noted, "Mr. Pack corroborates Mr. Martin's testimony," emphasizing

11

the importance of Martin's testimony. The prosecutor also discussed MacDonald's testimony and other witnesses at length. Brown also notes the prosecutor asked the jury not to discount Pack's testimony, but this is not incompatible with considering his testimony with caution.

Brown also notes the jury requested a readback of only Pack's and Brown's testimonies to support his argument that Pack's testimony played a critical role. Brown argues this suggests these two testimonies were the crux of the case for the jury. The jury's reasons for wanting the readback, however, are not part of the record. Any guesses as to these reasons are speculation on the part of Brown. Since Pack's testimony was corroborated and the district court gave instructions on witness credibility, the failure to give an accomplice cautionary instruction does not constitute reversible error.

However, we note that although the facts of this case cause the error to be harmless, the failure to give an accomplice instruction where appropriate is an error and we stress that is should be given when appropriate.

We will next consider whether the change of judges during jury deliberations constituted reversible error.

Brown argues a substitute judge took the bench during jury deliberations without complying with K.S.A. 43-168, and this constituted reversible error. During deliberations, the jury asked for a readback of Pack's testimony and Brown's testimony. Judge Parrish later stopped the readback and stated:

> "We are back on the record in the middle of read back. I have another jury trial that is starting. I have jurors waiting for this other jury trial. I'm asking if counsel have any objection to Judge Hendricks, who's standing behind me, to be the presiding judge over the remainder of the read back."

Neither counsel objected. Prior to taking the bench, Judge Hendricks did not indicate he had familiarized himself with the record. After Judge Hendricks took the bench, the readback continued. At the end of the readback, Judge Hendricks stated, "Ladies and gentlemen, as you know, I came in late so I'm assuming that's the testimony you asked the read back for. Counsel, would you agree that's the read back you requested?" Both attorneys agreed. Judge Hendricks gave the jurors a 15-minute recess and returned them to deliberations. Before the jury returned a verdict, Judge Parrish returned to the bench. Judge Parrish did not indicate she had familiarized herself with the portion of the record she had missed before returning to the bench.

*Standard of Review*

The State argues this issue is not properly before us due to invited error. Under the invited error doctrine, a party may not invite error then complain of the error on appeal. *State v. Verser*, 299 Kan. 776, 784, 326 P.3d 1046 (2014). This court has previously held that when a defendant is asked if there are any objections to the substitution of a judge and the defendant fails to object, the defendant has invited error and cannot raise the claim on appeal. *State v. Atkinson*, No. 90,356, 2004 WL 1542324, at *6 (Kan. App. 2004) (unpublished opinion). In this case, Judge Parrish asked defense counsel if there were any objections to the substitution, and defense counsel said there were not. Thus, invited error may bar Brown's claim from review. The *Atkinson* court, however, chose to address the merits of the claim because it involved judicial conduct, so we will continue the analysis of this issue.

This issue was not raised before the district court. Generally, issues not raised before the district court cannot be raised for the first time on appeal. See

*State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014). There are, however, several exceptions to this rule. A newly asserted theory may be heard for the first time on appeal if (1) the newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) consideration of the theory is necessary to serve the ends of justice or to prevent denial of fundamental rights; and (3) the judgment of the trial court may be upheld on appeal despite its reliance on the wrong ground or having assigned a wrong reason for its decision. *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014).

Brown argues this issue is reviewable because it meets both the first and second exceptions. It meets the first exception because it is a matter of statutory interpretation which is purely a question of law. It meets the second exception because the substitution of a judge who is not thoroughly familiar with the trial record violates a defendant's constitutional right to a fair trial. Brown's only support for this second contention is *State v. Boyd*, 27 Kan. App. 2d 956, 961-62, 9 P.3d 1273 (2000), *abrogated on other grounds by State v. Brown*, 300 Kan. 565, 331 P.3d 797 (2014). The *Boyd* court noted that "a criminal defendant is not denied any constitutional right when the original trial judge is replaced by another judge who is thoroughly familiar with the record." *Boyd*, 27 Kan. App. 2d at 961-62. Brown argues the inverse implication is a substitute judge who is not familiar with the record denies a constitutional right, but provides no other support. Other jurisdictions, however, have held a defendant's constitutional rights were not violated by the substitution of an unfamiliar judge if there was no prejudice to the defendant. See, *e.g.*, *United States v. Boswell*, 565 F.2d 1338, 1341-42 (5th Cir. 1978); *People v. Lewis*, 422 N.Y.S.2d 380, 383 (1979). In any case, we can at least review this issue under the first exception since the facts are uncontested, and the only issue is interpretation of K.S.A. 43-168.

Interpretation of a statute is a question of law subject to unlimited review. *State v. Eddy*, 299 Kan. 29, 32, 321 P.3d 12, *cert. denied* 135 S. Ct. 91 (2014). The substitution of judges during a jury trial is governed by K.S.A. 43-168, which states:

> "If by reason of death, sickness or other disability the judge before whom a jury trial has commenced is unable to proceed with the trial, another judge sitting in or assigned to the court in which the action is being tried, upon certifying that he has familiarized himself with the record of the trial, may proceed with and finish the trial." K.S.A. 43-168.

If a judge fails to familiarize himself or herself with the record before substitution, a reviewing court must "assume prejudice unless the record shows beyond a reasonable doubt that no significant prejudice occurred." *Boyd*, 27 Kan. App. 2d at 963. There can be no prejudice to the defendant, however, if the substitute judge performs only ministerial acts. *Boyd*, 27 Kan. App. at 962.

*Ministerial Acts*

While Kansas courts have held that receiving a jury verdict is a ministerial act, they have never addressed whether presiding over jury deliberations is also a ministerial act. See *Peterson v. State*, 203 Kan. 959, 965, 457 P.2d 6 (1969). A number of other jurisdictions have addressed substitution of judges during jury deliberations. Annot., 45 A.L.R.5th 591. Several states have held presiding over jury deliberations is a ministerial act, and in some cases have extended this to include rereading the original jury instructions given by the trial judge or responding to jury notes during the trial judge's absence. See, *e.g.*, *People v. Moon*, 107 Ill. App. 3d 568, 574, 437 N.E.2d 823 (1982); *Gibson v. State*, 334 Md. 44, 50-51, 637 A.2d 1204 (1994); *Lewis*, 422 N.Y.S.2d at 383. These courts generally reasoned that because the substitute judge did not perform any acts that

15

required personal knowledge of the case, presiding over jury deliberations was purely ministerial. See, *e.g.*, *Moon*, 107 Ill. App. 3d at 574; *Gibson*, 334 Md. at 51; *Lewis*, 422 N.Y.S.2d at 383. Other states have found jury deliberations are still part of the trial process which requires the same judge, and any substitution during deliberations is reversible error. See, *e.g.*, *State v. Jones*, 6 Ariz. App. 26, 28, 429 P.2d 518 (1967); *State v. Gossett*, 11 Wash. App. 864, 871-72, 527 P.2d 91 (1974). In those states that found substitution during deliberations was reversible error, however, the substitute judge had performed some action that arguably required some knowledge of the case. See, *e.g.*, *Jones*, 6 Ariz. App. at 27 (substitute judge denied request for readback of testimony "because of the nature of the request, and he not being the trial judge."); *Gossett*, 11 Wash. App. at 870-71 (substitute judge provided further instruction at request of jury). Thus, the decisive question in determining whether a judge's acts are ministerial or not appears to be whether those acts required personal knowledge of the case.

Based on the facts of this case, Judge Hendricks appears to only have performed a ministerial act. Judge Parrish received the jury's request for a readback of testimony and made the decision on how to fulfill the request. Judge Parrish was also present at the beginning of the readback. While Judge Hendricks presided over the end of the readback, he does not appear to have made any decisions regarding the readback of the testimony. He did ask if the readback had fulfilled the jury's request, but Judge Parrish is the one who made the decision on how the jury's request would be fulfilled. Neither the State nor Brown objected at any point during the readback, therefore Judge Hendricks was not required to rule on any objections. Because Judge Hendricks' actions did not require any personal knowledge of the case at hand, his acts were ministerial and no prejudice can be found.

*Harmless Error*

Even if Judge Hendricks' acts were not ministerial, the record shows beyond a reasonable doubt that no significant prejudice resulted. In *Boyd*, one judge substituted for another mid-trial without certifying he had familiarized himself with the record. Because the defendant was unable to show he was prejudiced in any way, the *Boyd* court found no prejudice beyond a reasonable doubt. 27 Kan. App. 2d at 963. The failure to comply with K.S.A. 43-168 was much less egregious in this case. Judge Hendricks took the bench after all evidence had been heard and counsel had given closing arguments. He only presided over the second half of a readback of testimony. While the readback was not transcribed, the portions of the transcript readback were listed in the transcript. Additionally, the State, defense counsel, and Brown were all present during the readback. Both parties consented to the substitution and both parties agreed the readback had been satisfactory. Furthermore, the jury had already heard the testimony once live. While Judge Hendricks' failure to comply with K.S.A. 43-168 may not have been best practice, it did not constitute reversible error.

Even if we find any error to be harmless, Brown encourages us to overturn the holding in *Boyd* and instead find that violations of K.S.A. 43-168 are reversible error as a matter of law. Brown points to a concurring and dissenting opinion in *Boyd* to support his argument. Judge Lewis argued that a judge who fails to familiarize himself or herself with the record has no authority to preside over a trial, and any such trial is void. 27 Kan. App. 2d at 966 (Lewis, J., concurring and dissenting).

While Judge Lewis' reading of K.S.A. 43-168 is a possible reading of this statute, it is not the most common one. This court has noted "[t]he purpose of K.S.A. 43-168 is to require a judge that is going to take over in the middle of an

17

ongoing trial to be familiar with the record in the case." *Atkinson*, WL 1542324, at *6. Facilitating the substitution of judges is intended to prevent mistrials or undue delays in proceedings. See, *e.g.*, *People v. Gonzalez*, 51 Cal. 3d 1179, 1211, 275 Cal. Rptr. 729, 800 P.2d 1159 (1990), *superseded by statute on other grounds* ("[W]hen the original judge becomes unavailable during trial, prudent substitution may have no actual effect on fairness and is often manifestly preferable to a mistrial."); *Boyd*, 27 Kan. App. 2d at 963 ("Continuity in the trial of a case is an important value."). Viewed in this light, harmless error analysis, rather than per se reversible error, is more consistent with the intentions of the statute. See, *e.g.*, *Lewis*, 422 N.Y.S.2d at 383 (finding harmless error ruling was "consistent with a judicial policy to facilitate the administration of justice, a policy which seeks to eliminate delay in the trial of criminal actions or costly retrial, with due regard for the constitutional rights of a defendant"). For these reasons, we will continue applying harmless error analysis to violations of K.S.A. 43-168. In this case, Judge Hendricks' substitution did not cause any prejudice, and any error was harmless.

We will now address the question of whether cumulative error deprived Brown of the right to a fair trial.

Brown argues that even if none of the above errors constitute reversible error individually, their cumulative effect denied him of a fair trial. Under the cumulative error test, courts analyze whether the totality of the circumstances establish the defendant was substantially prejudiced by cumulative errors and was thus denied a fair trial. In assessing the cumulative effect of errors during the trial, the appellate court examines the errors in the context of the entire record, considering how the trial judges dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence. *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014). The court will find no cumulative error when the record fails to support the errors defendant raises on appeal. See *State v. Betancourt*, 299 Kan. 131, 147, 322 P.3d 353

18

(2014). A single error cannot constitute cumulative error. *State v. Williams*, 299 Kan. 509, 566, 324 P.3d 1078 (2014).

The only possible errors in this case are the district court's failure to give the accomplice cautionary instruction and the improper substitution of Judge Hendricks. Neither of these errors, however, appear to have prejudiced Brown. Pack's testimony was partially corroborated and the jury was properly instructed on the credibility of witnesses. Furthermore, the evidence against Brown at trial was strong. The record does not demonstrate any prejudice from the temporary substitution of Judge Hendricks during jury deliberations. Because these errors did not result in substantial prejudice, Brown was not denied a fair trial.

Finally, we will consider whether the district court erred in using Brown's juvenile adjudications to increase his sentence without requiring the State to prove them beyond a reasonable doubt.

For the first time on appeal, Brown argues the district court erred when it considered juvenile adjudications in his criminal history without requiring their proof beyond a reasonable doubt. He claims the inclusion of his juvenile adjudications increased the penalty for his offense beyond the statutory maximum, in violation of *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).

A challenge to the constitutionality of a statute is a question of law subject to unlimited review. *State v. Hitt*, 273 Kan. 224, 226, 42 P.3d 732 (2002), *cert. denied* 537 U.S. 1104 (2003). Kansas appellate courts have considered *Apprendi* claims for the first time on appeal because they only involve a question of law arising on proved or admitted facts and are determinative of the case, and consideration of the argument is necessary to serve the ends of justice or to prevent the denial of fundamental rights. See, *e.g.*, *State v.*

*Gould*, 271 Kan. 394, 404-05, 23 P.3d 801 (2001); *State v. Conley*, 270 Kan. 18, 30-31, 11 P.3d 1147 (2000).

As Brown acknowledges, the Kansas Supreme Court has already decided juvenile adjudications may be used to determine a defendant's criminal history score without proving them to a jury beyond a reasonable doubt. *Hitt*, 273 Kan. at 236; see also *State v. Waller*, 299 Kan. 707, 728-29, 328 P.3d 1111 (2014) (noting the holding in *Hitt* is limited to juvenile adjudications which were final before June 20, 2008, because a later case found juveniles had a constitutional right to a jury trial). Because there is no indication the Kansas Supreme Court is departing from this position, we are duty bound to follow precedent. *State v. Ottinger*, 46 Kan. App. 2d 647, 655, 264 P.3d 1027 (2011), *rev. denied* 294 Kan. 946 (2012).

Affirmed.